RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0229p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

  *v.*                                                     No. 15-3719

DERRYL L. TANNER,

  *Defendant-Appellant.*

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:14-cr-00382—Benita Y. Pearson, District Judge.

Argued: June 15, 2016

Decided and Filed: September 13, 2016

Before: SILER, ROGERS, and SUTTON, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Christina Wong, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, for Appellant. Mark S. Bennett, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Christina Wong, Melissa M. Salinas, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, for Appellant. Mark S. Bennett, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

───────────────

**OPINION**

───────────────

ROGERS, Circuit Judge. Derryl Tanner was convicted on a guilty plea for executing a series of fraudulent loans involving a house and two vehicles. He was sentenced to sixty

months' imprisonment, a below-Guidelines term. On appeal, Tanner challenges his sentence on several grounds. Tanner is not entitled to relief on his ineffective-assistance claims or on his challenge to a two-level role enhancement. However, because Tanner was given two criminal history points for a state-court case that resulted in only one sentence—albeit for two crimes—his Guidelines range was not calculated properly. Resentencing is therefore required.

The indictment in this case centered on a bank fraud scheme involving a luxury home on Fitzroy Street in Westlake, Ohio (the Fitzroy house). The participants in the scheme—Tanner, co-defendant Julie Becker, and several unindicted co-conspirators—collaborated to obtain a mortgage and two lines of credit on the Fitzroy house. Tanner's fraudulent vehicle loans, the result of his efforts alone, came later.

The bank fraud began in April 2006. As the Fitzroy house was being built, Tanner learned that the owner of the company overseeing construction had fallen on tough financial times and wanted to sell the house for construction costs. Tanner then conspired with Becker for her to serve as the straw buyer of the property. Under Tanner and Becker's agreement, Becker would not have to provide a down payment, and she would also receive a kickback after the purchase of the house for her participation in the transaction. Although the construction costs amounted to $1.357 million, Tanner and a real estate agent prepared a purchase agreement in Becker's name for $2.1 million. The difference between those two figures represented the amount that Tanner and his co-conspirators hoped to receive from the property sale.

After securing Becker's agreement to join the scheme, Tanner worked on obtaining a loan from First Place Bank (First Place). Becker signed the purchase agreement for the house, falsely stating in that document that she had deposited $10,000 in earnest money with the seller. Tanner also conspired with Becker for her to sign a promissory note benefitting the seller in the amount of $315,000, and representing to First Place that the seller would have a second mortgage. Tanner knew all the while, however, that Becker would not be required to make the monthly payments on the note. Becker then submitted to First Place the loan application, which contained false information about her income and assets. An unindicted co-conspirator also provided $320,000 for a down payment. Before First Place approved the loan, Tanner assured the bank that Becker was an associate producer with a film company that Tanner owned, and that

the company paid Becker between $180,000 and $350,000 per year. Although Tanner did own a film company, none of the information about Becker's employment or salary was true.

First Place approved the application in August 2006, funding a loan of $1.47 million. Most of the proceeds were distributed to the seller of the Fitzroy house. The balance went to the real estate agent who prepared the purchase agreement and the co-conspirator who provided the down payment.

About a week later, Tanner coordinated applications in Becker's name for two home-equity loans, from banks other than First Place. Tanner did so to withdraw the false equity created by the inflated purchase price for the Fitzroy house. For the first loan, Tanner submitted false tax returns grossly overstating Becker's income. After the bank approved a $250,000 loan, Tanner transferred large sums from Becker's personal bank account—where the funds were initially deposited—to his own accounts. Several weeks later, Tanner and Becker filed another fraudulent loan application in Becker's name. That application, too, was approved, putting another $350,000 into the co-defendants' pockets. Tanner then moved into the Fitzroy house with his partner, and lived there for four years. After several years, however, the mortgage payments proved overwhelming, and foreclosure soon followed. The plea transcript and the pre-sentence investigation report (PSR) indicate that First Place lost $670,000 in the foreclosure. The other banks lost $250,000 and $350,000, the full amount of the loans.

In addition to the bank fraud, Tanner also scammed two companies for the purpose of obtaining new vehicles. After entering false information concerning his employment and income in loan applications, Tanner was approved for loans on a 2010 Acura TL and a 2010 Toyota Tundra. Both vehicles were repossessed and resold at a loss after Tanner failed to make payments. This fraud—perpetrated by use of the mail system—occurred between April and August 2010, near the end of Tanner's stay in the Fitzroy house.

All of this led to a six-count indictment in October 2014. For Tanner's and Becker's actions regarding the mortgage and two home-equity loans, the indictment charged them with conspiracy to commit bank fraud and three counts of bank fraud. Tanner was also charged with mail fraud for his fraudulent car-loan applications. In February 2015, Tanner pled guilty to all

six counts.  At the plea hearing, following the prosecutor's recitation of the facts, Tanner and his counsel expressed concern that a leader/organizer role enhancement would apply to Tanner as a matter of law based on the prosecutor's recitation.  The prosecutor stipulated, however, that Tanner was not agreeing that the enhancement applied by pleading guilty, and that the parties would argue the facts on this issue at sentencing.

The PSR that was filed by the probation department before sentencing contained a paragraph asserting that Tanner "was an organizer, leader, manager, or supervisor" of the bank fraud under U.S.S.G. § 3B1.1(c).  Tanner's counsel objected to the so-called role enhancement, arguing that "in the big picture," Tanner was not a leader or organizer.  In arguing the applicability of the role enhancement at sentencing, Tanner's counsel also asserted that unindicted co-conspirators fed the bank-fraud scheme to Tanner and that Tanner "got swept up in the idea" that he should be living a lavish lifestyle.  Not persuaded, the district court applied the role enhancement.

The two-level increase for the enhancement and a three-level decrease for acceptance of responsibility put Tanner's offense level at twenty-two.  That number, combined with a criminal history score of seven, yielded a Guidelines range of 63–78 months.  Of particular relevance here, two of the seven criminal history points were attributable to a state-court criminal case that included convictions for felonious assault and domestic violence.  After accounting for the 18 U.S.C. § 3553(a) factors, the district court sentenced Tanner to sixty months' imprisonment, in addition to $1.3 million in restitution.  Tanner appeals the judgment entering that sentence.

Tanner is entitled to resentencing because he was erroneously assessed two criminal history points for a state-court case instead of one point, an error that generated a higher Guidelines range than he should have had.  None of Tanner's remaining challenges to his sentence, however, has any merit.  In the first place, Tanner's claim that the district court committed procedural error by applying a role enhancement falls short, as the record supports the finding that Tanner was a leader and organizer of the bank fraud.  Nor do the ineffective-assistance claims warrant relief.  Not only does resentencing moot those claims, but the claims should not be reviewed at this juncture anyway.

**I.**

Tanner's sole winning claim concerns the calculation of criminal history points based on Case No. 081793 in the Court of Common Pleas of Lorain County, Ohio. Tanner received only one sentence for the two crime-of-violence offenses in that case. That means that he should have been assessed only one criminal history point under U.S.S.G. § 4A1.1, reducing his total points from seven to six. Such an error warrants resentencing under the correct Guidelines range.

This claim involves the application of § 4A1.1(e) to the judgment in Case No. 081793. Section 4A1.1 allows for the addition of criminal history points based on prior sentences. That section provides:

> (a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month.
>
> (b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).
>
> (c) Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this subsection.
>
> (d) Add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status.
>
> (e) Add 1 point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above because such sentence was treated as a single sentence, up to a total of 3 points for this subsection.

U.S.S.G. § 4A1.1. Subsection (e) carves out an exception to another provision of the Guidelines, § 4A1.2(a)(2), which indicates that multiple prior sentences must be treated as a single sentence if the underlying offenses were not separated by an intervening arrest, and "the sentences resulted from offenses contained in the same charging instrument . . . or . . . the sentences were imposed on the same day." Under § 4A1.1(e), a sentence that would remain uncounted for purposes of a defendant's criminal history calculation nonetheless receives a point if the underlying conviction was for a crime of violence. In other words, if a defendant received two sentences for two crime-of-violence convictions, § 4A1.1(e) requires courts to assess a point for each sentence.

In this case, the district court assessed two points under § 4A1.1 for Case No. 081793. That case arose from an incident on October 17, 2010, when Tanner struck his partner twice in the face and broke her arm by punching it. Charges for felonious assault, domestic violence, and endangering children followed soon after. All three charges were resolved on a guilty plea. Neither party in this case disputes that felonious assault and domestic violence—felonies of the second and fourth degree, respectively—are crimes of violence for purposes of § 4A1.1(e), and that misdemeanor child-endangerment is not. *See* § 4B1.2(a)(1) (defining crime of violence). At sentencing in this case, the district court relied on the PSR, which described the three charges and noted that Tanner had been sentenced to three years' probation, among other sanctions. In calculating Tanner's points, the district court assessed him one point under § 4A1.1(c) and one point under § 4A1.1(e), ostensibly so that Tanner would receive points for both the felonious-assault and domestic-violence counts.[1]

Assessing two points was an error because the two crimes in question resulted in only one sentence. We apply plain-error review with respect to this issue, as recognized by the Government, because Tanner did not object specifically to the assignment of the two points. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). Failure to calculate the Guidelines range correctly generally results in plain error. *See United States v. McCloud*, 730 F.3d 600, 603 (6th Cir. 2013) (quoting *United States v. Rosenbaum*, 585 F.3d 259, 266 (6th Cir. 2009)).

Here the error is plain. The fairest reading of the judgment in Case No. 081793 is that Tanner received one sentence on the three counts. The judgment indicates that Tanner pled guilty to the three charges and was "sentenced to Community Control on count(s) I, II & III." The sentencing portion of the judgment shows that Tanner was sentenced to one term of three years' probation and five additional sanctions, including community service. Under Ohio law, probation and other community-control sanctions may be combined to form a single sentence, *see* Ohio Rev. Code §§ 2929.15(A), 2929.17, and nothing in the judgment indicates that some of the sanctions correspond to one of the crime-of-violence convictions but not the other. To the

---

[1]The five remaining criminal history points were attributable to three sentences in unrelated matters, as well as the fact that Tanner committed the bank fraud while serving two of those sentences.

contrary, the judgment states that the "defendant [is] sentenced to Community Control" before listing the probation term and additional sanctions. That language suggests that the sanctions constitute just one sentence. Nor does the part of the judgment addressing what would happen if Tanner violated the sanctions indicate the term of imprisonment that Tanner would receive for each offense if probation was revoked. This, too, suggests that Tanner received only one sentence.

Ohio's "allied offenses" rule explains why the judgment likely contains one sentence even though Tanner pled guilty to three crimes. In Ohio, every conviction must generally receive its own sentence. *See State v. Saxon*, 846 N.E.2d 824, 828 (Ohio 2006). Courts are thus prohibited from "grouping offenses together and imposing a single, 'lump' sentence for multiple felonies." *Id.* The rule against imposing a single sentence for multiple offenses is limited, however, by a statute providing that "[w]here the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." Ohio Rev. Code § 2941.25(A). The word "convicted" in the statute has been interpreted to refer to both the conviction "*and* the imposition of a sentence or penalty." *State v. Whitfield*, 922 N.E.2d 182, 185 (Ohio 2010). Defendants, then, "may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses." *Id.* at 187 (citation omitted). "[T]he trial court [thus] effects the merger at sentencing." *Id.* (citation omitted).

Such a merger probably happened here. The facts in the PSR concerning Case No. 081793 suggest that felonious assault and domestic violence are allied offenses in the context of that case, and that Tanner therefore received only one sentence for those convictions. In determining whether offenses should be merged at sentencing, Ohio courts assess whether the offenses involved separate conduct, whether the offenses were "committed with separate animus or motivation," and whether the offenses "involv[ed] separate victims or [separate] harm." *State v. Trigg*, No. 26757, 2016 WL 1730270, at *3 (Ohio Ct. App. Apr. 29, 2016). Each factor points in favor of merging felonious assault and domestic violence. First, both charges were likely based on the same conduct—Tanner hitting his partner twice with a remote control and

punching her arm, all within the span of a few seconds.  Indeed, domestic violence requires proof of the same elements as felonious assault, along with the additional requirement that the victim be a family or household member.  *See* Ohio Rev. Code §§ 2903.11(A)(1) (felonious assault), 2919.25(A) (domestic violence).  Second, the only motivation for Tanner to hit his partner appeared to involve Tanner's anger about his partner's comment concerning another woman.  Third, the same person was the victim of both crimes.  In similar circumstances, the Ohio Court of Appeals has required merger of these two felonies at sentencing.  That case is on all fours.  There, as here, a defendant punched the same victim multiple times in a short time period, and that conduct led to felonious assault and domestic violence charges.  *See Trigg*, 2016 WL 1730270, at *1, *3.  The allied-offenses rule thus explains why the judgment in Case No. 081793 does not on its face provide for multiple sentences.[2]

That conclusion is not affected by the trial court's failure to explicitly link the sentence to one of the two allied offenses.  It is true that under state law, the prosecutor has the authority to decide which allied offense the defendant will be sentenced on, and that a court must specify in the judgment the offense to which the sentence attaches.  *See Whitfield*, 922 N.E.2d at 188.  It is also true that if Tanner had appealed the community-control sentence, the Ohio Court of Appeals may have remanded for specification of which allied offense served as the basis for the sentence.  Even so, any error in that respect does not relate to whether the trial court imposed more than one sentence.  "Whether a prior sentence counts for criminal history purposes is a question of federal, not state law."  *United States v. Morgan*, 390 F.3d 1072, 1074 (8th Cir. 2004) (citation omitted).  Our inquiry for purposes of § 4A1.1(e) is whether the judgment contained one sentence, not whether the judgment met every requirement of state law.

In short, the judgment in question is better read to include only one sentence for the felonious-assault and domestic-violence convictions.  Tanner should have therefore not been assessed a criminal history point under § 4A1.1(e) for that case.  What is more, the one criminal history point would have made a difference.  With a criminal history score of seven, Tanner was in Category IV.  Decreasing Tanner's score by one point, however, puts him in Category III.

---

[2]As child endangerment is not a crime of violence, we need not determine whether that offense is an allied offense as well.

*See* U.S.S.G. ch. 5, Sentencing Table. That category, when combined with an offense level of 22, results in a range of 51–63 months instead of 63–78. The new baseline must provide the starting point for Tanner's sentence.

A final point deserves brief mention. The applicability of § 4A1.1(e) does not turn on whether the conduct underlying Case No. 081793 occurred in a single episode or on the same day. As that provision allows for the addition of points to a defendant's criminal history score based on prior sentences, not offenses, *see United States v. Scott*, 654 F.3d 552, 556–57 (5th Cir. 2011), the relevant question is whether Tanner received multiple sentences. The record strongly suggests that only one sentence was entered in Case No. 081793.

## II.

Tanner's other claim of procedural error, on the other hand, does not warrant relief. Because the evidence supported a finding that Tanner was a leader and an organizer of the bank fraud, a two-level enhancement for Tanner's role was proper. The Guidelines provision at issue allows for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" other than the activity described in other subsections of that section. U.S.S.G. § 3B1.1(c). In holding that Tanner's conduct warranted the enhancement, the district court reasoned:

> But I think decidedly, Mr. Tanner, your admitted behavior was that of either or both an organizer or leader, minimally. I think relative even to Ms. Becker, whose culpability is less than your own, who was not involved until she was invited in by you, who was led by you, so that certainly qualifies you as a leader.
>
> But then the organizer component . . . .
>
> There is no way, and I think you can agree with this, that you could have maintained or obtained possession of the Fitzroy property and the home equity lines without organizing the activity of those who were unindicted but involved and also Ms. Becker, at a minimum.

Later in the sentencing proceeding, the district court also rejected the idea that the real estate agent duped Tanner into participating in the fraud, noting that Tanner was intelligent and articulate. Review of the district court's factual findings supporting this enhancement is limited

to clear error. *See United States v. Wilson*, 630 F. App'x 422, 431 (6th Cir. 2015) (citing *United States v. Washington*, 715 F.3d 975, 982–83 (6th Cir. 2013)).

The record supported these findings. The primary question for a § 3B1.1(c) enhancement is whether the defendant exerted control over at least one individual within a criminal organization. *See United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000). Factors relevant to control include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, [and] the degree of participation in planning or organizing the offense." *United States v. Salyers*, 592 F. App'x 483, 485 (6th Cir. 2015) (quoting U.S.S.G. § 3B1.1 cmt. n.4). The control criterion is satisfied by virtue of Tanner's relationship to Becker. As an initial matter, Tanner recruited Becker to be a straw buyer for the Fitzroy house. Because no evidence suggests that Becker would have become involved in the scheme without Tanner, he served as the link between Becker and the unindicted co-conspirators. As the district court found, that Tanner was involved in the scheme before Becker and used her name to buy the house thus strongly supports the notion that he was a leader of the conspiracy. So does the fact that Tanner—not Becker—lived in the multi-million dollar house for four years. Still more, Tanner organized the scheme by telling First Bank that Becker worked for his company and that she earned a salary well into the six figures. Moreover, it was Becker's name that Tanner used to obtain $600,000 in home-equity loans. Finally, the plea transcript suggests that Tanner moved funds in and out of Becker's bank account at will after the home-equity loans were deposited. This, too, indicates control. In short, Tanner acted as more than a mere foot soldier by coordinating the fraudulent mortgage and by cashing in on the false equity created by the sale of the house. That is enough to warrant application of § 3B1.1.

Tanner counters by arguing that he did not recruit Becker and that the record does not indicate that he obtained more proceeds than Becker, but neither point requires a different conclusion. First, it is appropriate to characterize as "recruitment" Tanner's acts of inviting Becker to participate in the scheme, using Becker as a straw buyer for the house, and using Becker's information for the home-equity-loan applications. Our decision in *Vandeberg*, 201 F.3d 805 (6th Cir. 2000), is not to the contrary, as there is a world of difference between that

case and this one. In *Vandeberg*, not only did the prosecutor agree with the defendant that the role enhancement did not apply, *see id.* at 811, but the defendant's participation in the conspiracy consisted primarily of providing information to a co-conspirator that facilitated the co-conspirator's burglary of a house, *see id.* at 808, 811. The defendant did not physically participate in the burglary. *Id.* at 808. Nor did any evidence suggest that the defendant recruited the co-conspirator or initiated the criminal activity. *Id.* at 811. Tanner bears little resemblance to the defendant in *Vandeberg*, because Tanner was directly responsible for Becker's involvement and his participation in the bank fraud was hands-on.

Second, as for the division of the spoils of the fraud, the record supports the inference that Tanner obtained more proceeds than Becker. Tanner lived for four years in a house worth far north of a million dollars. In addition, the plea transcript indicates that Tanner transferred large amounts of the loan proceeds into his own account. Tanner's sentencing memorandum also admitted that "Tanner received the larger share of the equity" from the lines of credit. Even if the evidence regarding Tanner's proceeds were not as strong, the touchstone "control" requirement is nonetheless satisfied by Tanner's recruitment of Becker, his planning of the fraud, and his use of Becker to perpetrate the offense. At bottom, Tanner's quarrel with the role enhancement is that he did not come up with the idea to commit bank fraud. Yet a conspirator in a fraud scheme may be a leader or organizer even if the fraud was not his brainchild. The district court's findings on this enhancement were not clearly erroneous.

**III.**

Although Tanner also asserts several claims of ineffective assistance of counsel, now is not the time to bring those claims. This is a direct appeal. The general rule is that ineffective-assistance claims cannot be brought on direct appeal, *see United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005) (citation omitted), and this case is no exception. In any event, those claims—which relate solely to sentencing—are mooted by the conclusion that resentencing is necessary.

The judgment of the district court is vacated, and the case is remanded for proceedings consistent with this opinion.